NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RIALTO-CAPITOL CONDOMINIUM ASSOCIATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> BURLINGTON INSURANCE COMPANY, *et al.*, <br><br> Defendants. | No. 19cv12811 (EP) (JBC) <br><br> **OPINION** |

**PADIN**, **District Judge.**

This is a third-party insurance dispute stemming from Defendant Burlington Insurance Company (the "Insurer") denial of indemnification and defense to its insured, non-party CCC Renovation, Inc. ("CCC") for masonry work at two buildings in the Beacon complex in Jersey City (the "Property"). CCC assigned its claim to Plaintiff Rialto-Capitol Condominium Association, Inc. (the "Association"), who commenced this action. The Insurer now moves for summary judgment dismissing the Complaint. D.E. 82 ("Mot.")

This matter's extensive record distills to a single issue: whether CCC's work on the Property, which was done in 2010, caused water damage that manifested only after the relevant insurance policy began in 2011. Because the record contains genuine issues of material fact best reserved for a jury, Defendant Burlington Insurance Company's motion seeking summary judgment will be **GRANTED IN PART** and **DENIED IN PART** for the reasons below.[1]

---

[1] The Court decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L.Civ.R. 78(b).

I.  **BACKGROUND**[2]

    A.  **The Property**

The Property is part of the Beacon complex comprising several brick-clad, art deco style mid- and high-rise buildings listed on the National and the New Jersey Registers of Historic Places. Insurer Facts ¶ 19; Ass'n Facts ¶ 2. The Property was part of the original Jersey City Medical Center ("JCMC"), which operated from 1928 until 2003. Insurer Facts ¶ 20. The JCMC officially ceased operations at the Property on May 16, 2004, though many buildings had been vacant for decades and in various stages of disrepair. *Id.* The Property's façades evidenced deteriorated mortar and "extensive vertical cracks." *Id.* ¶ 21.

    B.  **The Sponsor begins to redevelop the Property**

George Filopoulos, the owner of real estate brokerage Metrovest Equities, Inc. ("Metrovest"), identified the Property as a potential redevelopment site in 2002. Ass'n Facts ¶ 3; D.E. 82-17 at 7 ("Filopoulos Dep."), 20:11-14. In 2003, Filopoulos created Baldwin Asset Associates Urban Renewal Company LLC ("Baldwin") to serve as the Property's master development sponsor. Ass'n Facts ¶ 4. The Property included two high rises to be developed into a condominium: the Rialto and Capitol (21 and 20 stories, respectively). *Id.* ¶ 6.

Filopoulos formed Defendant Rialto-Capitol Urban Renewal Company, LLC ("RCURC") to take title to the Property and to serve, together with Baldwin, as the sponsor (the "Sponsor") for the condominium public offering. *Id.* ¶¶ 7, 9; Filopoulos Dep. 30:1-14, 41:6-13.

---

[2] These facts are drawn from the following documents, viewing the evidence in the light most favorable to the Association, the non-movant:

Insurer Facts – The Insurer's Statement of Material Facts Not in Dispute, D.E. 82-3.
Ass'n Opp'n Facts – the Association's Responses to the Insurer Facts, D.E. 82-14 at 1.
Ass'n Facts – The Association's Counter-Statement of Material Facts, D.E. 82-14 at 5.

2

In 2005, Metrovest took title to the Property from the Jersey City Redevelopment Agency. Insurer Facts ¶ 22. Metrovest, together with Baldwin, formed the Association to administer, operate, and manage the Property's common elements. *Id.* ¶ 23.

In 2003, the Sponsor retained Goldstein Associates Consulting Engineers (the "Sponsor's Engineers") as the structural engineer for the Property's façade rehabilitation and interior structural repairs. Ass'n Facts ¶ 8; D.E. 82-17 at 117 (Ex. 3). The Sponsor's Engineers began a survey of the Property's existing conditions in late 2003 to early 2004. Ass'n Facts ¶ 9; D.E. 82-17 at 129-142 (Ex. 4). After their initial survey work, the Sponsor's Engineers prepared a set of façade restoration plans in 2004; the plans listed the types of repairs needed—cracked and bulging brick and mortar repair—and their general location. Ass'n Facts ¶ 10; D.E. 82-17 at 144-148 (Ex. 5).

The Sponsor retained architect Ismael Levya Architects (the "Architect") in 2004 to design the Property's interior. Ass'n Facts ¶ 11; D.E. 82-17 at 149-153 (Ex. 6). The Architect prepared interior demolition plans for 2005 that called for gutting every floor up to the interior face of the exterior brick wall. Ass'n Facts ¶ 12; D.E. 82-17 at 154-181 (Ex. 7). The "majority of" the demolition occurred that year. Ass'n Facts ¶ 13; Filopoulos Dep. 114:9-16.

C.  **CCC's work begins in 2006**

Following the Sponsor's Engineers' bid process, the Sponsor entered into a contract on November 14, 2005 with ERC Classic Restoration ("ERC") to perform the Property's façade repairs. Ass'n Facts ¶ 15; DE. 82-18 at 4 (Ex. 9). ERC retained CCC as its "primary" subcontractor at the beginning of the restoration in 2006, working "on every area" where ERC worked. Ass'n Facts ¶¶ 16-17; D.E. 82-18 at 8 ("Ricciardelli Dep."), 86:4-11, 291:23-292:2 ("They were the lead guys.").[3]

---

[3] Deposition of ERC's owner Frank Ricciardelli.

3

In 2006, the Sponsor hired Turner Construction ("Turner") to serve as the general contractor for the Property's interior work.  Ass'n Facts ¶ 18; D.E. 82-18 at 18-24 (Ex. 11). Turner installed new framing, insulation, and sheetrock.  *Id.*; Ass'n Facts ¶ 19. Turner's and ERC/CCC's work occurred simultaneously.  Ass'n Facts ¶ 20; Filopoulos Dep. 137:6-18.  Turner worked from the bottom floors upward, while the façade contractors, working in 20-to-30-foot-wide "drops," started at the top and worked down.[4]  Ass'n Facts ¶ 21.  Thus, in some instances, Turner finished work on a floor before its entire façade was repaired, including floors with window openings that had yet to have their windows installed.  Ass'n Facts ¶ 22; Filopoulos Dep. 133-140.

ERC/CCC's initial façade work was based on the Sponsor's Engineers' report, initially prepared with the use of binoculars and photos from terrace and roof areas.  Ass'n Facts ¶¶ 9, 23.  But once the work started, the Sponsor's Engineers ascended the now-assembled scaffold, conducted an inspection, and prepared field reports listing additional necessary work or inspections.  Ass'n Facts ¶¶ 24, 25; Schnellbacher Dep. 118:16-119:9[5]; D.E. 82-18 at 34 (Ex. 13); D.E. 82-19 at 1-38 (Ass'n Ex 14).  The façade contractors would then redo each drop to perform that additional work.  Ass'n Facts ¶ 26.  This work progressed throughout 2006.  *Id.* ¶ 27.

D. **Leaks occur throughout 2006 and 2007—and, according to the Association, are repaired**

In late 2006, a Nor'easter storm caused water leaks throughout the Property that damaged interior components, *e.g.*, drywall, already installed by Turner.  Ass'n Facts ¶¶ 28-29; Filopoulos Dep. 136:7-14; D.E. 82-19 at 40 (Ex. 15).  Water intrusion was attributed to the incomplete exterior façade work.  Ass'n Facts ¶ 30; Filopoulos Dep. 270-72.  But to avoid delays, the work continued

---

[4] There were "over 115 drops."  Ass'n Facts ¶ 21.
[5] Eric Schnellbacher of the Schnellbacher-Sendon Group LLC ("SSG"), an additional façade repair contractor.

as before.  *Id.*  All interior damage was identified and the Sponsor authorized Turner to make repairs.  Ass'n Facts ¶ 32; Filopoulos Dep. 274:1-13.

From January to June 2007, as interior and exterior work continued, leaks appeared during each significant rain event, again damaging Turner's interior work.  Ass'n Facts ¶ 33; Filopoulos Dep. 142-145.  The Sponsor hired Environmental Health Investigations ("EHI") to conduct inspections, including moisture and mold testing.  Ass'n Facts ¶ 34; Filopoulos Dep. 138-139.  EHI issued reports identifying damage and making repair recommendations, and Turner replaced damaged materials through change orders.  Ass'n Facts ¶ 35; Filopoulos Dep. 142-145; D.E. 82-19 at 54-142 (Exs. 17-26); D.E. 82-20 at 1-7 (Exs. 27-28).  In total, the Sponsor spent over $500,000 repairing rain damage.  Filopoulos Dep. 273-274.

### E.  Different contractors finish façade work between 2007 and 2008

Unit owners began moving into the Property in July 2007.  Filopoulos Dep. 166:1-5.  By letter dated August 9, 2007, the Sponsor retained the Schnellebacher-Sendon Group ("SSG") to replace ERC (and therefore its subcontractor CCC) for the façade work.  Ass'n Facts ¶ 52; D.E. 82-20 at 20 (Ex. 30).  The Sponsor terminated its contract with ERC on December 3, 2007.  Ass'n Facts ¶ 53; D.E. 82-20 at 31.

Between December 2007 and March 2008, Metrovest paid for $700,000 in façade repairs to non-ERC entities.  Ass'n Facts ¶ 56; D.E. 82-20 at 79-106 (Exs. 34-36).  Turner completed its interior work in early 2008.  Ass'n Facts ¶ 55; Filopoulos Dep. 117:13-18.  The Sponsor's Engineers issued "Final Inspection Sign-Offs," the last one in March 2008, for every area of the Property where façade subcontractors performed work.  Ass'n Facts ¶¶ 57-60; D.E. 82-21 (Exs. 37-38).

**F.     More leaks occur in 2008**

About six months after the Sponsor's Engineers' final sign-off in March 2008, and after over a year without leaks, the Property again experienced leaks following a major storm. Ass'n Facts ¶ 62; D.E. 82-22 at 1-17 (Exs. 39-40). The Sponsor again retained the Sponsor's Engineers, who issued reports and recommended repairs. Ass'n Facts ¶ 63; D.E. 82-22 at 19-21 (Ex. 41). AGD Construction, a façade company with the same owner as CCC, billed for repair work between September and December 2008. Ass'n Facts ¶¶ 64-68; D.E. 82-22 at 22-51 (Exs. 42-46). Interior damage was also repaired. D.E. 82-22 at 50 ("Fierro Dep."), 246-247.[6] After that time period, there were no leak reports for almost another year. Ass'n Facts ¶ 70.

**G.     Leaks resume in late 2009, and CCC returns in 2010 for more façade work**

Metrovest entered into a September 1, 2009 contract with CCC for façade work on the Property. Ass'n Facts ¶ 71; D.E. 82-22 at 59-64 (Ex. 48). In November 2009, leak reports resumed; the Sponsor again hired the Sponsor's Engineers to inspect and detail repairs. Ass'n Facts ¶¶ 72-73; D.E. 82-22 at 71-78 (Exs. 50-51). Another cycle of CCC's façade repairs and the Sponsor's Engineers' inspections occurred throughout 2010. Ass'n Facts ¶¶ 74-94; Exs. 52-72. The last work that CCC billed Metrovest for was in July 2010. D.E. 82-23 at 14 (Ex. 72).

Eventually, in May 2011, the Sponsor retained a different façade contractor, Vector Structural, to perform some of the repairs. Ass'n Facts ¶¶ 95-101; Exs. 74-80. Vector's last work was performed in May 2012. Ass'n Facts ¶ 102; Ex. 81. Phil Fierro, a Sponsor representative, testified that when he left the project in 2011, he was not aware of "any unit owner's complaints of water infiltration that had not been remediated or repaired." Fierro Dep. 287:24-25, 289:22-16.

---

[6] Phillip R. Fierro was a Metrovest representative.

H. **The Insurer issues the Policies to CCC, after CCC's work at the Property had concluded**

CCC submitted an insurance application to the Insurer on July 1, 2011. Ass'n Facts ¶ 130; D.E. 82-24 at 377 (Ex. 86). CCC's application noted that it worked in New York and New Jersey.[7] D.E. 82-24 at 377, ¶ 6. The Insurer issued policies to CCC spanning July 1, 2011 to July 1, 2014 (collectively the "Policies" and the "Policy Period"). Insurer Facts ¶ 5; D.E. 82-5. The Policies contained, among other provisions, identical language excluding coverage for work on a condominium, except to repair work done prior to the issuance of a certificate of occupancy (the "Condo Exclusion"):

> This endorsement does not apply if "your work" occurs or "your products" are supplied or incorporated after such residential structure was certified for occupancy except for such work if performed to repair or replace "your work" or "your product" that was completed or incorporated prior to the certificate of occupancy.

D.E. 82-24 at 383 (Ex. 88).

I. **The Association retains its own experts**

Unit owners moved into the Property in July 2007, when temporary certificates of occupancy were issued. Ass'n Facts ¶ 137; D.E. 82-24 at 385 (Ex. 89). It is undisputed that CCC worked on the Property from early 2006 to December 2007, and then again from September 2009 to August 2010. Ass'n Facts ¶ 136.

Majority control over the Association's Board of Trustees shifted from the Sponsor to Property unit owners in 2011 or 2012. Ass'n Facts ¶ 104. The newly unit owner-controlled Association retained FWH Engineering ("FWH") in 2012 to perform a transition inspection. Ass'n Facts ¶ 105; D.E. 82-23 at 98-166 (Ex. 82). FWH reported water infiltration through windows,

---

[7] Previously, during the underwriting process, the Insurer had been advised that 5% of CCC's overall work was in New Jersey. D.E. 82-24 at 381 (Ex. 87).

7

terrace doors, partition walls, and at floor bases, all "'issues related to the façade.'" Ass'n Facts ¶ 106 (quoting Ex. 82).

The Association then retained Berman & Wright ("B&W") to conduct more extensive investigations. Ass'n Facts ¶ 108. B&W's extensive investigation between 2013 and 2017 resulted in an eleven-volume report detailing various Property damage including cracked masonry; microbial growth; deteriorating sealant; and damaged framing, insulation, and electrical. Ass'n Facts ¶¶ 108-120; D.E. 82-24 at 2-307 (Exs. 83-84).

B&W opined that the Property has "had new cracks through the brick and masonry of the buildings occur in each year from 2007 through 2013," thereby causing "new events of water intrusion … each year from 2007 through 2013." D.E. 82-24 at 340 (Ex. 85, Mar. 31, 2021 B&W Report (the "B&W Report")). B&W likewise opined that the "brick and masonry cracking events were caused by the exterior façade, interior façade, concrete, and roof/terrace defective design and construction deficiencies discussed" in that report and an earlier 2017 report. *Id.*

### J.     The Insurer denies coverage/defense of the 2013 State Action

The Association sued the Sponsor and its design professionals and contractors in October 2013 (the "State Action"). Ass'n Facts ¶ 122; *Rialto-Capitol Condo. Ass'n, Inc. v. Baldwin Assets Assoc. Urban Renewal Co., LLC, et al.*, Docket No. HUD-L-4994-13. CCC, through its defense counsel, submitted a tender for defense and indemnification to the Insurer on July 12, 2016. Ass'n Facts ¶ 138; D.E. 82-24 at 390 (Ex. 90).

One week later, on July 19, 2016, the Insurer acknowledged the tender. Ass'n Facts ¶ 139; D.E. 82-25 (Ex. 91). Robert Lough, the Insurer's representative handling CCC's claim, entered a note on August 3, 2016: "Appears alleged damages in process, prior to [Insurer] policy periods.

All above policies have [the Condo Exclusion], but if project was already occupied, may not apply." Ass'n Facts ¶ 140; D.E. 82-25 at 16.

On May 26, 2016, the Insurer denied coverage. About two years later, on August 23, 2018, an attorney representing CCC[8] in the State Action wrote to the Insurer. The letter argued that the Condo Exclusion did *not* apply because CCC's work post-dated temporary certificates of occupancy and unit owners moving in. Ass'n Facts ¶¶ 143-144; D.E. 82-26 at 12 (Ex. 93).[9]

The next day, Lough entered a note in the Insurer's claim file noting the "push back from coverage counsel," that "all work performed by [CCC] post-dated the project's [certificate of occupancy] date of 10/16/09." D.E. 82-25 at 13-14. Lough noted that the Insurer "need[ed] to definitively determine if [CCC's] work in fact pertained to subject project and if it was incorporated into the project prior to the [certificate of occupancy] date, as this is the exception to the [Condo Exclusion]." *Id.* at 14. However, Lough could not recall conducting any such investigation. D.E. 82-26 at 69 (Ex. 94, "Lough Dep.").[10]

The State Action went to trial in September 2018. Ass'n Facts ¶ 123. The Association settled with all defendants left in the case, including CCC. *Id.* ¶¶ 124, 125. Rutgers Specialty Insurance, who had been defending CCC, paid the Association $1,000,000. Ass'n Facts ¶ 125. CCC agreed to entry of a $5,000,000 consent judgment (about 6.7% of the claimed $75,000,000 in damages) in exchange for the Association's agreement that it would only pursue collection of

---

[8] Via Rutgers Specialty Insurance.
[9] This would later form the basis for part of Plaintiff's bad faith claim, *i.e.*, that a "modicum of investigation" would have revealed that "CCC worked on the Rialto and Capitol Buildings from early 1006 to December 2007 and then again from September 2009 to August 2010." Opp'n at 45-46.
[10] No reason is provided. Lough's claim notes, however, indicate that the coverage counsel's "push back" was untimely given that a trial date was scheduled for less than a month later, on September 17, 2018.

9

the consent judgment from CCC's carriers who had refused to participate in the underlying case, including the Insurer. *Id.*; D.E. 82-5 (Ex. A, "Consent Judgment").

### K.     This action and motion

Pursuant to the Consent Judgment, the Association filed suit against the Insurer. The Association originally filed this action in state court on April 4, 2019; the Insurer later removed it to this District on diversity grounds.[11] Ass'n Facts ¶ 126; D.E. 1-3 ("Compl." or "Complaint"). The Complaint alleges three causes of action: declaratory judgment, breach of contract, and breach of the covenant of good faith and fair dealing (a "bad faith claim"). *Id.* After discovery, the Insurer moved for summary judgment. D.E. 82-4. The Insurer argues that New York law should apply; that the Policies did not cover damage to the Property because the damage occurred, or was occurring, prior to the Policy Period; and that the Association could not prove a bad faith claim.

The Association opposed. D.E. 82-16 ("Opp'n"). The Insurer replied. D.E. 82-27 ("Reply").[12]

## II.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[11] Plaintiff does not dispute diversity jurisdiction, and this Court is independently satisfied that the parties have demonstrated complete diversity and satisfaction of the monetary threshold. *See* 28 U.S.C. § 1332(a).

[12] The parties exchanged the briefs, then filed them simultaneously.

The moving party has the initial burden of showing the basis for its motion and demonstrating that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must cite specific materials in the record. Fed. R. Civ. P. 56(c)(1)(A).

If the moving party adequately supports its motion, then the burden shifts to the nonmoving party to "go beyond the pleadings" and designate specific facts on the record that demonstrate a genuine dispute for trial exists. *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). Specifically, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to provide such evidence, or where the "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50). However, "[i]f reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250-51.

In reviewing a motion for summary judgment, a court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). But even if material facts remain disputed, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 322.

III.     DISCUSSION

   A.     **New Jersey law applies to this dispute**

The Insurer argues that New York law should govern this dispute, while the Association argues that New Jersey law should govern. Mot. at 11; Opp'n at 5. The Court agrees with the Association that New Jersey law applies.

   *1.     There is a conflict between New York and New Jersey law*

The first step in choice-of-law analysis is to determine whether an actual conflict exists. *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 173 (3d Cir. 2011). The Insurer argues that there is none. First, the Insurer argues that there is no procedural conflict between New York and New Jersey law because both states employ similar choice-of-law tests. *See* Reply at 5. But this misapprehends the governing law; in a diversity action, "a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits." *Fogel*, 656 F.3d at 170-71. What matters is whether the states' laws "differ on a 'point in issue.'" *Mega Constr. Corp. v. XL Am. Grp.*, 684 F. App'x 196, 199 (3d Cir. 2017) (quoting *Pfizer, Inc. v. Emps. Ins. of Wausau*, 154 N.J. 187 (1998) (finding difference where New Jersey and Pennsylvania courts define "accident" differently)). Thus, whether or not New Jersey and New York apply identical or differing choice-of-law tests, New Jersey choice-of-law analysis applies.

Second, the Insurer argues that there is no substantive conflict between New York and New Jersey law because the ultimate outcome would be the same under either: the Court would find that the Policies did not encompass CCC's work. Whether or not that is the case, however, at least one "point in issue" is whether the Insurer acted in bad faith by denying CCC's claim. And the parties agree that New York does not recognize bad faith denial of coverage as an independent tort, while New Jersey does. *See* Opp'n at 12; Mot. at 31-32; *compare Wiener v. Unumprovident*

12

*Corp.*, 202 F. Supp. 2d 116, 124 (S.D.N.Y. 2002) *with Pickett v. Lloyd's*, 131 N.J. 457, 470 (1995). Accordingly, there is a conflict and the Court must determine which state's law applies.

> 2. *New Jersey law governs the dispute because it has the most significant relationship to the case*

When faced with a conflict, New Jersey courts apply the *Restatement (Second) of Conflict of Laws* ("Restatement"). *See Fogel*, 656 F.3d 167, 171-73 (3d Cir. 2011) (citing *Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 134 N.J. 96 (1993)); *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28 (1980). Restatement § 193, the "starting point" for liability-insurance choice-of-law disputes, says the law of the state that the parties understood to be the "principal location of the insured risk" governs unless some other state has a "more significant relationship" to the case under Restatement § 6. *Id.* at 173. "An insured risk like an 'activity' that is the 'subject matter of the insurance'— is 'principally located' in a state if it occurs there during a 'major portion of the insurance period.'" *Mega Constr. Corp. v. XL Am. Grp.*, 684 F. App'x 196, 199 (3d Cir. 2017) (quoting Restatement § 193 cmt. b); *see Gilbert*, 629 A.2d at 889. "A court should generally give the location of the insured risk "greater weight than any other single contact." *Oneida Plaza, LLC v. Ohio Sec. Ins. Co.*, No. 20-4485, 2022 U.S. Dist. LEXIS 14726, at *12 (E.D. Pa. Jan. 27, 2022).

The Insurer argues that New York law should apply because the Policies were brokered, issued, and signed in New York. But the place of contracting and initial location of the parties is not, by itself, sufficient. *See Fogel*, 656 F.3d at 178. Moreover, application of New Jersey law "would hardly be unfair to the insurance company, at least with respect to some issues, if the company had reason to foresee when it issued the policy that there might be a shift to another state of the principal location of the risk." *Parker v. State Farm Ins. Co.*, 543 F. Supp. 806, 811 (E.D. Pa. 1982) (citing *Restatement* § 193 cmt. d). So, for example, the "location of the insured risk"

matters more for insurance related to buildings than for moveable chattel like cars. *See id.*; *see also* Restatement § 193 cmt. b ("In the case of chattels, the significance of the state of the risk's principal location diminishes with the length of time that it can be anticipated the chattel will be in other states during the term of the insurance.").

The Insurer could reasonably have expected that its insured's New Jersey masonry work meant New Jersey law would apply. *See id.* (applying Pennsylvania law where insured's construction work occurred in Pennsylvania, and thus had potential to cause property damage there). It is undisputed that the Policies, and negotiations preceding them, noted that a portion of CCC's work—masonry—would be performed in New Jersey. Masonry, of course, is performed exclusively on stationary buildings. And because the work underlying this action was performed on a New Jersey building, New Jersey has a substantial interest in enforcing its laws.

This distinguishes the matter from *NL Indus. v. Commercial Union Ins. Co.*, 65 F.3d 314 (3d Cir. 1995), cited by the Insurer, in which the Third Circuit found that New York law should apply. Though, like, the Policies here, the *NL* policy was negotiated and signed in New York, none of the *NL* plaintiff's underlying tort claims involved New Jersey plaintiffs. Thus, New Jersey law governs because it has the most significant relationship to the issues.

> B. **A genuine issue of material fact exists as to whether CCC's work before the Policy Period caused damage during the Policy Period**

The parties agree that the Policies covered property damage only if, as relevant here, the damage occurred "during the policy period" and no insured's employee knew about the damage at issue:

> prior to the policy period, no insured … and no "employee" authorized … to give or receive notice of an "occurrence" or claim, knew that the … "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the … "property damage" occurred, then

14

> any continuation, change or resumption of such … "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

D.E. 82-5 at 43.

But an amendment replaced that provision with language limiting coverage to property damage that, "whether known or unknown to any person":

> a. *Did not first occur prior to the inception date of the policy*;
> b. *Was not in the process of occurring and is not alleged to have been in the process of occurring, as of the inception date of the policy*; and
> c. Was not in the process of settlement, adjustment, "suit" or other proceeding of any kind (including, but not limited to, any repair attempts or any statutorily mandated loss resolution or presuit process) as of the inception date of the policy.

D.E. 82-5 at 76 (emphasis added).

The parties agree that this language is unambiguous. Indeed, the Policies mean what they say: that they do not cover damages caused by CCC's defective work that either existed or began to exist prior to the Policy Period. Mot. at 14-19; Opp'n at 15. But the issue is when the relevant *damages* began—according to the Association, in 2011—and whether CCC's work caused those damages. *See Tim Ryan Constr., Inc. v. Burlington Ins. Co.*, No. C12-5770, 2012 U.S. Dist. LEXIS 178993, at *18 (W.D. Wash. Dec. 17, 2012) (analyzing similar policy language and holding that "[t]he inception date of the damages, like the extent of [the contractor's] liability, resulting from work performed by them, is an issue for the trier of fact to decide").

As the Association highlights, the Insurer relies on an inapposite case, *Travelers Cas. & Sur. Co. v. Dormitory N.Y.*, 732 F. Supp. 2d 347, 350 (S.D.N.Y. 2010). The insurance policy in that matter, like the unamended Policies' language here, disclaimed coverage where the insured "knew that the … 'property damage' had occurred, in whole or in part." *Id.* But the Policies here do not disclaim coverage that was *known*; they disclaim damage that *existed or began* before the

15

Policy Period. For that reason, the *Dormitory* court focused on the insured's knowledge of the defect, which is not relevant here.

The Insurer cites *Air Master & Cooling, Inc. v. Selective Ins. Co. of Am.*, 452 N.J. Super. 35 (Super. Ct. App. Div. 2017), arguing that its policy, like the one here, applied only to property damage that did not first occur prior to the policy's inception date. Reply at 12. But *Air Master expanded* the scope of the Insurer's potential liability, holding that latent conditions created by an insured before an insurance policy might still be covered even if the conditions' damages manifest after a policy begins.

*Air Master* endorsed the "continuous-trigger" doctrine in the property damage context. The doctrine, first utilized in personal injury/asbestos-exposure cases, recognized that "because certain harms such as asbestos-related diseases will progressively develop over time, 'the date of the occurrence should be the continuous period from exposure to manifestation.'" 452 N.J. Super. 35, 43 (quoting *Owens-Illinois, Inc. v. United Insurance Co.*, 138 N.J. 437, 454-56 (1994)). Under that approach, "all the insurers over that period [are] liable for the continuous development of the disease." *Id.*

*Air Master* analogized the doctrine to property damage matters, finding that "property damage within a building can be latent and undetected, behind walls and above ceiling tiles, and can gradually worsen and advance over time. . . . The progressively-worsening nature of a variety of construction defects, *such as water infiltration or mold*, logically support the application of the continuous-trigger doctrine." *Id.* (emphasis added) (citing *The Palisades at Fort Lee Condominium Ass'n, Inc. v. 100 Old Palisade, LLC*, 230 N.J. 427, 454 (2017)). The doctrine is not unfair to insurers "that were on the risk during policy periods as an injury progressed to the point of ultimate manifestation. Such insurers simply would be bearing a portion of the aggregate

16

coverage burden that had accumulated while the yet-to-be-manifested harm worsened." *Id.* at 47-48.

Most importantly, *Air Master* discussed how to determine when the "last pull" of the continuous trigger occur, *i.e.*, when latent property damage manifests and triggers coverage. Notably, the Insurer does not mention *Air Master*'s ultimate holding: that a remand to the trial court was appropriate because the Appellate Division could not "tell with any confidence what, if any, information [other than hearsay] about the building defects was or reasonably could have been revealed between the time of the unit owners' complaints to" the beginning of the relevant insurance policy. *Id.* at 55. Significantly, there were no depositions taken of anyone with salient knowledge. *Id.*

The Insurer, apparently trying to distinguish that outcome, argues that "the record is clear that the property damage at issue first occurred prior to the [Policies' inception date]," was "occurring as of the inception date," and "that the property damage was known prior to CCC's involvement at the Property and prior to" the Policies' inception date. Reply at 12. The Insurer essentially argues that the record proves that all damage was created, manifested, and known, prior to the Policies' first inception date in 2011, *i.e.*, by the time CCC's work had concluded in 2010.

But as the Association argues, the record is not so clear. As detailed above, the record contains sufficient evidence of the following. The Sponsor's Engineers surveyed the Property and developed a plan to repair the façade. Ass'n Facts ¶¶ 9-10. Beginning in 2006, contractors, including CCC, performed some of those repairs, drop by drop. *Id.* ¶¶ 15-17. Meanwhile, rain events occurred throughout this period, causing significant interior damage and revealing further water intrusion that had to be addressed. But throughout these repairs, for a period of about four

years, the Sponsor's Engineers inspected the repairs, ordered additional repairs when appropriate, and ultimately approved each drop.  *Id.* ¶¶ 23-26, 57-60.

The record also contains expert reports supporting the Association's theory.  First, in 2011, after unit owners obtained majority control, the Association retained FWH to perform a transition inspection.  Ass'n Facts ¶ 105.  FWH's 2012 report concluded that water intrusion appeared in 2011 that "appear to be … related to the façade."  D.E. 82-23 at 116.  Thereafter, the Association retained B&W, who issued reports identifying significant damage related to water intrusion.  The second report, dated March 31, 2017, reviewed much of the same record here, and made note of significant periods of time—for example, July 2007 through September 2008 and late 2008 through September 2009—when no water damage manifested.  D.E. 82-24 at 328.  The report opined, as relevant here, that façade defects "have resulted in new events of excessive condensation in the plenum spaces which have caused new damages and mold growth to occur each year from 2007 through 2013, and each year since 2013."  *Id.* at 340.

Though the Court expresses no opinion about the ultimate outcome, this record is clearly more robust than the *Air Master*'s.  From this record, a jury could find that all water intrusion/façade issues had been fixed (and the parties believed they had been fixed) as of 2010, and thus that any defects that appeared in 2011 and during the Policy Period were new manifestations of latent conditions that CCC caused in 2010 (or earlier).  Or a jury could likewise conclude that they were new conditions completely unrelated to CCC's work, and therefore not covered by the Policies.  But that determination is for a jury, not for this Court.  *See Selective Ins. Co. of Am. v. TRH Builders, Inc.*, No. A-1015-15T3, 2017 N.J. Super. Unpub. LEXIS 2265, at *8 (Super. Ct. App. Div. Sep. 11, 2017) (denying summary judgment based on evidence that mold

and rot, which caused the wood damage that homeowners reported, formed during the policy period). Accordingly, summary judgment can be denied on that basis.

### C. The existence of a genuine issue of material fact precludes a finding of bad faith

As discussed above, New Jersey law applies to this dispute. And under New Jersey law, all contracts impose an implied obligation of good faith and fair dealing in their performance and enforcement. *Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 347 (1993). "[B]ad faith is established by showing that *no debatable reasons* existed for denial of the benefits." *Pickett v. Lloyd's (A Syndicate of Underwriting Members)*, 131 N.J. 457, 481 (1993) (emphasis added). That standard applies to an insured's bad faith third-party coverage claim. *Universal-Rundle Corp. v. Commercial Union Ins. Co.*, 319 N.J. Super. 223, 251 (App. Div. 1999). "[N]either negligence nor mistake is sufficient to show bad faith—rather, a plaintiff must demonstrate 'that the insurer's conduct is unreasonable and the insurer knows that the conduct is unreasonable, or that it recklessly disregards the fact that the conduct is unreasonable.'" *Enright v. Farm Family Cas. Ins. Co*., No. 03-4850, 2005 U.S. Dist. LEXIS 37544, at *8 (D.N.J. Dec. 29, 2005) (quoting *Pickett*, 131 N.J. at 474)).

Importantly, "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad faith refusal to pay the claim." *Tryko Mgmt. Servs. LLC v. Lloyd's Syndicate 3624*, No. 20-1285, 2023 U.S. Dist. LEXIS 54959, at *22-23 (D.N.J. Mar. 30, 2023). Thus, the Association's success in opposing the Insurer's summary judgment motion is a double-edged sword. The Association has successfully demonstrated that an issue of fact exists as to whether CCC's pre-2011 work caused 2011 (and beyond) damage. But that issue of fact means that the Association cannot establish that there was "no debatable reason" for the Insurer's denial. There is at least one

19

"debatable reason" here: the Insurer based its denial on the fact that the Policies, which began in 2011, did not cover pre-2011 work.  Reply at 16 (citing Lough Dep. 33-34, 56-57).

Accordingly, the Court will grant summary judgment as to the Association's bad faith claim.

## IV.   CONCLUSION

For the reasons above, Defendant Burlington Insurance Company's summary judgment motion will be **GRANTED IN PART** to the extent that Plaintiff Rialto-Capitol Condominium Association, Inc.'s bad faith claim (count III) will be **DISMISSED WITH PREJUDICE**, and **DENIED IN PART** as to the remainder of the motion.

An appropriate Order follows.

September 25, 2023

_Evelyn Padin_
Evelyn Padin, U.S.D.J.